FILED

DEC 13 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

IN THE NORTHERN DISTRICT COURT
CALIFORNIA

JOHANNA R. WHEELER )      CASE NO. **CV-19-08077** —DMR

Plaintiff,

)

vs.

)      JUDGE: **DONNA M. RYU**

CARRINGTON MORTGAGE SVCS, LLC..,

)

Defendant.

---

## EX PARTE REQUEST FOR IMMEDIATE
## TEMPORARY RESTRAINING ORDER
## RELATIVE TO FRAUDULENT CHAIN OF TITLE
## AND ILLEGAL FORECLOSURE ATTEMPTS

---

NOW COMES PLAINTIFF in pursuit of Justice and the right to Due Process to file this Complaint and Request for Immediate Injunctive Relief and Immediate Temporary Restraining Order. Plaintiff, subject to Sworn Oath and Threat of Perjury as to all factual allegations, hereby solemnly avers:

### PARTIES

1.    At all times relevant herein, Plaintiff was a female over the age of 18 residing at 36 Ruth Avenue, Hampden, ME 04444.

2.    Carrington Mortgage Services (Carrington) is a California Corporation, a subsidiary of and affiliate of Wells Fargo, doing business in California, purporting to have authority as Servicer to foreclose on Plaintiff's home.

## JURISDICTION

3.     Defendant is headquartered in Anaheim, California and conducts substantial business in that area and throughout the United States. The amount in controversy exceeds $75,000.00 with substantial certainty.

## FACTS

4.     On or about May 19, 2008, Plaintiff executed a Note and Mortgage on the Property with Taylor, Bean & Whitaker. Significantly, neither MERS nor MERSCOPRP are noted anywhere on said Mortgage. (Appendix A).

5.     Taylor, Bean & Whitaker was raided by the FBI in or about August of 2009 for corruption and its Chairman, Lee Farkas, was sentenced to 30 years in prison for his mastermind role in orchestrating lending fraud schemes at the country's 5th largest Mortgage House.

6.     Thereafter, MERS purportedly assigned the Mortgage to Bank of America, N.A. on or about June 14, 2012, using "all beneficial interest." i.e. Beneficiary Status. (Appendix A).

7.     MERS had absolutely *no authority* whatsoever to assign anything to anyone because it could not legally possess true ownership interest in the Note.

8.     The Note *must* travel with the Mortgage.

9.     Subsequently, Taylor, Bean & Whitaker appears in an October 4, 2017, purported Quitclaim Assignment to Defendant, Carrington, falsely and illegally claiming MERS as "Mortgagee." (Appendix A).

10.    Such activity led noted New England Foreclosure Defense Attorney, Thomas Cox, Esq. to write:

11.

       "With this being a Taylor, Bean Whitaker loan using a MERS mortgage, they have a problem. The two assignments, from MERS to B of A, and then from B of A to Carrington, are insufficient to get ownership of the mortgage, and thus standing to foreclose, to Carrington." (Appendix B)

12.    Taylor, Bean & Whitaker was a notoriously corrupt company, whose front man was convicted in a $2.9 billion mortgage scam, according to the U.S.

Department of Justice: https://www.justice.gov/opa/pr/former-chairman-taylor-bean-whitakerconvicted-29-billion-fraud-scheme-contributed-failure

According to court documents and evidence presented at trial, the fraud scheme began in 2002, when Farkas and his co-conspirators ran overdrafts in TBW bank accounts at Colonial Bank in order to cover TBW's cash shortfalls. Farkas and his co-conspirators at TBW and Colonial Bank transferred money between accounts at Colonial Bank to hide the overdrafts. Evidence presented at trial showed that after the overdrafts grew to more than $100 million, Farkas and his co-conspirators covered up the overdrafts and operating losses by causing Colonial Bank to purchase from TBW over time more than $1.5 billion in what amounted to worthless mortgage loan assets, including loans that TBW had already sold to other investors and fake pools of loans supposedly being formed into mortgage-backed securities. Farkas and his co-conspirators caused Colonial Bank to report these assets on its books at face value when in fact the mortgage loan assets were worthless. By August 2009, approximately $500 million in fake pools of loans remained on Colonial Bank's books.

13. As such, the purported mortgage loan is already presumptively fake. This is compounded by the fact that a current MERS lookup on the purported loan indicates that it is owned by Bank of America, who has, of course, not allegedly owned it since the phony Quitclaim Assignment noted herein.

14. A Complaint for foreclosure was filed by Attorney Molly McGuire on or about April 23, 2018.

15. Plaintiff received a Summons on or about May 10, 2018, and she responded to the Complaint with a responsive pleading on or about May 24, 2018.

16. The case was subsequently referred to Mediation Diversion on or about May 31, 2019.

17. Whereupon Plaintiff and Defendant were allegedly engaged in HAMP negotiations at times relevant to this with Defendant (before calling her "an idiot" – more on this later), falsely informing her "*All foreclosure activity is on hold while your RMA application is in review so you do not need to worry.*" (see below, a direct cut-and-paste of an August 6, 2018 email:

\*\*\*\*\*\*\*\*\*\*

---------- Forwarded message ---------
From: Alicia Herrera <Alicia.Herrera@carringtonms.com>

Date: Mon, Aug 6, 2018 at 4:49 PM
Subject: RE: 6000003477
To: Johanna Athas <jwemt81@gmail.com>
Cc: aliciaacevedo618@gmail.com <aliciaacevedo618@gmail.com>

Can you send the application to aliciaacevedo618@gmail.com? All foreclosure
activity is on hold while your RMA application is in review so you do not need to
worry.

All documentation related to an application for assistance should be sent to
MortgageAssistance@CarringtonMS.com

Thank you,

Alicia Acevedo – NMLS ID # 1064915
Home Retention Department Specialist
Carrington Mortgage Services, LLC NMLS ID # 2600
1600 South Douglass Road, Suite 110 & 200-A Anaheim, CA 92806
Phone: 800-561-4567
Document Processing Fax: 877-267-1331
Email: Alicia.Herrera@carringtonms.com

18.     To the contrary, facts will show that Defendant continued attempts at
        foreclosure by way of unlawfully Dual-Tracking this very hard-working
        family, even as complete RMA packages were submitted on June 30, 2018,
        August 30, 2018, May 8, 2018, June 20, 2019, and on August 6, 2019.

19.     Defendant initially failed to even provide a reliable access fax number for
        document submissions or a single point of contact, repeatedly falsely claimed
        that they lost documents, and falsely claimed that they did not receive
        documents.[1]

---

[1] The Court may take Judicial Notice of the fact that Ohio's Attorney General, Richard Cordray,
sued and settled with Defendant over these very issues – and others. See Section II, *infra*. The
Court may take Judicial Notice of the fact that Dual-Tracking became such an industry standard
that Congress specifically outlawed it by way of CFPB Directives in 2013 before the Agency was
basically gutted by the sitting U.S. President:

**Restricted Dual-Tracking:** Under the CFPB's new rules, dual-tracking – when the servicer
moves forward with foreclosure while simultaneously working with the borrower to avoid
foreclosure – is restricted. Servicers cannot start a foreclosure proceeding if a borrower has

20. Note that licensed professionals at the National Consumer Law Center have reviewed the file and determined that there was no legal way for such a foreclosure to occur because:

> "With this being a Taylor, Bean Whitaker loan using a MERS mortgage, they have a problem. The two assignments, from MERS to B of A, and then from B of A to Carrington, are insufficient to get ownership of the mortgage, and thus standing to foreclose, to Carrington."

This was noted in a July 18, 2017, email from Thomas Cox, Esq. to HUD Counselor, Jason Thomas (See Appendix B).

21. Plaintiff is not aware as to how the case actually got to Trial on or about April 9, 2019, because she never received any Dispositive Motions or Memoranda from Respondent. While it is unclear by the Order, she DID NOT ATTEND.

22. Moreover, the Court refused to provide her with a public document that might explain some of the mystery, i.e. the initial Case Scheduling Order that is issued when every new case is filed.

23. She does not have one, but based on information and belief, the Court does indeed issue one with every new case filing. The Court clerks instead asked her, "Why do you want that?"

24. Further, she remains in the dark because all the while she had worked with industry professionals to comply with any and all requirements of the loan modification process with Carrington, a highly predatory and abusive company widely-known for consumer abuse as shall be noted in Section II, *infra*.

25. Plaintiff complied on ***multiple occasions*** with document requests necessary to prosecute her RMA/HAMP application and hereby provides a sample of the documentation that was forwarded to Defendant by and through a HUD Counselor.

---

already submitted a complete application for a loan modification or other alternative to foreclosure, and that application is still pending review.

26.     Defendant has steadfastly stonewalled Plaintiff throughout the entire RMA process in Bad Faith, commencing with their failure to even provide a fax number or email address before July of 2018, as noted in her correspondence with HUD Counselor, Jason Thomas, another well-known and well-respected industry professional.

27.     On September 27, 2019, HUD Counselor, Jason Thomas, contacted Defendant via telephone to follow up on the status of Plaintiff's loan modification application after having complied with yet another document request for updated signatures several weeks prior, only to be informed that the property had been foreclosed upon in April of 2019 and had subsequently been purchased by Defendant at auction in August of 2019.

28.     In any event, Plaintiff informally petitioned the Court for Reconsideration on October 1, 2019.

29.     Defendant immediately moved for a Writ of Possession on October 2, 2019.

30.     Meanwhile, at her wit's end, Plaintiff filed a complaint with the Maine Attorney General/Maine Bureau of Consumer Credit Protection on or about October 6, 2019.  On or about October 9, Chief Field Investigator, Edward Myslik, did respond thusly:

                                    ********

Myslik, Edward Thu,
Oct 10, 9:06 AM to
me

Dear Johanna:

Yes, it is very early in our process of investigating this complaint.

For your information, Carrington was notified in writing of the complaint with hours of receipt by the Bureau, and I received a written acknowledgement from Carrington of receipt of the Notice of Complaint.

In the Notice of Complaint, Carrington was notified that the Bureau is requiring Carrington to cease any negotiation or sale of the property during the pendency of our

investigation, which I can only assume will take quite a bit of time and energy to complete.

Carrington was notified that the Bureau is requiring substantial documentation to evidence compliance with Maine law in all aspects of the foreclosure process and in all aspects of the loss mitigation process.

Yours,
Ed

\*\*\*\*\*\*\*\*\*

30.     Meanwhile the CEO of Carrington Mortgage, Bruce Rose, called Plaintiff an "idiot." From her May 27, 2017, Appeal:

May 27, 2017

To Whom It May Concern:

My name is Johanna R. Wheeler and my loan number is 6000003477. This letter serves as my official appeal to the decision that was made by Carrington Mortgage Services to deny my loan modification request. ......
    "Chuck –

    **This idiot has been pestering us and I can't even sort out all of the details what she is referring to.** Let's do two things here – solve whatever the current issue is ASAP and then get Ray to offer her a streamline refinance at whatever rate will incent her to refinance quickly, then sell her loan on a released basis into the market so that we are no longer dealing with her. Please let me know your thoughts. BR"



### *Carrington CEO, Bruce Rose*

Plaintiff immediately replied and stated, "At least I know how to double check my recipients before sending an email, so who's the idiot now?!" Almost immediately following this contentious email interaction, Plaintiff started receiving phone calls from the office of the CEO in a paltry attempt at damage control and Yadira Muniz, manager of Carrington's Customer Advocate Department, kept saying, "You weren't supposed to see that email." Plaintiff retorted, "Oh, so you're basically saying that it's perfectly acceptable for your CEO to call a customer an idiot or any other derogatory names just as long as they don't see or hear it?" Following this, there was dead silence on the line as Ms. Muniz clearly had no response to this question!



31. In the end, however, Defendant, in all of its hubris, continued asking Plaintiff for the same documents over and over again, i.e. updated signatures, bank statements, pay stubs, etc. etc. ad nauseam over the course of many months, all of which had already been submitted to them on *multiple* occasions:

From: **Jason Thomas** <Jason.Thomas@ceimaine.org>
Date: Mon, Aug 26, 2019 at 4:08 PM
Subject: Requested RMA, Wheeler/Athas, Loan# 6000003477
To: mortgageassistance@carringtonms.com <mortgageassistance@carringtonms.com>
Cc: Johanna Athas <jwemt81@gmail.com>
Please find attached the updated, new version of the RMA as requested in the ongoing review of:

Johanna Wheeler and Matthew Athas
36 Ruth Avenue
Hampden, ME 04444
Loan# 6000003477
Thanks in advance

# Jason Thomas

Director, Housing Counseling and Education

Email:        Jason.Thomas@ceimaine.org
Tel:          207-504-5866
Housing Tel:  877-340-2649
Housing Fax:  207-504-5915

www.ceimaine.org

32. Lastly, in cementing the nebulous nature of this purported loan, the MERS lookup webpage actually cites Bank of America as Servicer, even though they have not serviced this purported loan in YEARS (since 2014).

32. To add insult to injury, Defendant continues to send requests for documentation to this day, as will be demonstrated at Trial.

> ---------- Forwarded message ---------
> From: **Alicia Herrera** <Alicia.Herrera@carringtonms.com>
> Date: Tue, Aug 6, 2019 at 4:41 PM
> Subject: 6000003477
> To: JWEMT81@GMAIL.COM <JWEMT81@gmail.com>
>
> Dear Mortgagor(s),
>
> CMS received an application requesting assistance from you and after careful review we have determined that additional information is needed to complete your application. A detailed letter is being sent to you that outlines what documentation is missing, outdated or incomplete; however if you call us today we can go over the information that is needed and help get your on your way to the Underwriting process. Please call us at 800-5614567 Monday through Friday, 6 AM to 4PM PST. We look forward to assisting you!

**THIS EMAIL DOES NOT ACCEPT ATTACHMENTS SO DO NOT ATTEMPT TO
SEND DOCUMENTS TO THIS EMAIL BOX.**

All documentation related to an application for assistance should be sent
to MortgageAssistance@CarringtonMS.com

Thank you,
Alicia Acevedo – NMLS ID # 1064915
Home Retention Department Specialist

**33.    This is a National Pattern and Practice of Defendant and Respondent's
background is replete with patterns and practice of corruption and deceit.**

i.      <u>Ohio</u>:

Richard Cordray, former Director of the CFPB, sued Defendant many years ago over
these exact issues and the Settlement in Franklin County Court of Common Pleas was
massive.

https://www.housingwire.com/articles/ohio-ag-carrington-settle-mortgage-servicing-suit/
Ohio AG, Carrington settle mortgage servicing suit
May 23, 2011 By Jon Prior

> In 2008, Carrington committed to make good faith efforts to provide more
> workouts after its servicing practices were called into question by the Ohio AG.
> In 2009, then Ohio AG, Richard Cordray, and the Ohio Department of Commerce
> filed a joint complaint against Carrington, alleging it did not provide
> modifications in the state as required under that 2008 agreement.
>
> According to last week's settlement, Carrington will assign a single point of
> contact at the firm to work with borrowers who apply for a modification. The
> servicer will also implement a specific timeline for all requests, and it will
> suspend the foreclosure process while a loan is being evaluated for a workout.
> Internal reviews will also be set up for denied modifications. Carrington also
> agreed to provide relief to 60 Ohio homeowners that involve loans, to which
> Carrington acquired the servicing rights to in 2007.
>
>> "Ohio consumers benefit from mortgage servicers that work proactively to
>> avoid foreclosures. This settlement will allow Ohio homeowners to benefit
>> from higher standards of customer service and responsiveness,"
>
> ,,,,said Ohio Department of Commerce Director David Goodman.

ii.     <u>Texas</u>.

In *Wolf. vs. Wells Fargo and Carrington,* the Jury issued a resounding statement against Fraud as noted by Forensic Examiner, Marie McDonnell:

http://www.piggybankblog.com/2.0/wolf-vs-wells-fargo-wells-fargo-must-pay-5-4m-inrobosigning-foreclosure-row/

https://stopforeclosurefraud.com/2015/11/13/wolf-vs-wells-fargo-wells-fargo-must-pay5-4m-in-robosigning-foreclosure-row/

A Texas state jury awarded nearly $5.4 million to a couple accusing Wells Fargo, NA and others of "robosigning" documents that led to the wrongful foreclosure of their home, holding that the banking giant knew that documents supporting the foreclosure were fraudulent.

After four days of trial and just four hours of deliberation, the jury on Tuesday found that there was "clear and convincing evidence" that Wells Fargo and Carrington Mortgage Services LLC knew that the supporting documents were a fraudulent claim on the property owned... The jury awarded the Wolfs $190,000 in actual and emotional distress damages; $190,000 in attorneys' fees and $5 million in punitive damages to be paid equally by Wells Fargo and Carrington.

To wit:

### *QUESTION NO. 1*
*Did any defendant make, present, or use a document with:*

1. *knowledge that the document was a fraudulent lien or claim against real property, or an interest in real property; and*

2. *the intent that the document be given the same legal effect as a valid lien or claim against real property, or an interest in real property; and*

3. *the intent to cause the Plaintiffs to suffer financial injury or mental anguish or emotional distress?*
   *A lien is "fraudulent" if the person who files it has actual knowledge that the lien was not valid at the time it was filed.*
   *"Lien" means a claim in property for the payment of a debt and includes a security interest.*
   *Answer "Yes" or "No" as to the following:*
   ***Wells Fargo:  YES***

   ***Carrington:    YES***

iii.    Florida.

In *Marchisio vs. Carrington*, No. 17-10584 (11 Cir. March 25, 2019) the 11th Circuit expressly overruled the District Court's findings that homeowner Plaintiffs were not entitled to Punitive Damages after Carrington abused them after a foreclosure that was probably tainted in the first place:

> B. The First Federal Action
> 1. Partial Correction by Defendant:
> In response, in July of 2012, Plaintiffs filed an action in the United States District Court for the Southern District of Florida, Case No. 12-cv-14264-DLG, alleging, among other things, that Defendant violated the FCRA and the Florida Collections Act. In this First Action, Plaintiffs complained that, despite the state court order, Defendant continued to seek payment on the discharged mortgage and falsely reported to credit reporting agencies that the debt was delinquent.
>
> During this First Action, Defendant corrected its misreporting of the first loan by sending an automated universal dataform ("AUD") to the credit reporting agencies, requesting that they update the first loan to reflect that it had a zero balance effective December 31, 2009. But Defendant continued to misreport that Plaintiffs owed money under the second loan.
>
> 2. The Release and Settlement Agreement
> The parties resolved the First Action, entering into a "Release and Settlement Agreement" on January 23, 2013. It is this settlement agreement that Plaintiffs now contend Defendant breached. In exchange for dismissal of the district court action, Defendant agreed to (1) pay Plaintiffs $125,000 and (2) "report the Second Loan as having a zero balance as of December 9, 2009 to the same agencies and in the same fashion as it reported the First Loan, which reporting shall be done as soon as reasonably possible, but in any case within 90 days." The parties agreed that "[i]n the event of a material breach hereunder, the prevailing party in any action commenced to enforce [the] Agreement shall be awarded its reasonable attorney's fees, expenses, and costs." The parties acknowledged that "time is of the essence in the performance of the obligations of this Agreement."
>
> 3. Post-Settlement Activity:
> Despite a settlement agreement that should have resolved all outstanding issues, Plaintiffs continued to be plagued by Defendant's failure to accurately report extinguishment of the second loan. Given Defendant's intransigence, Plaintiffs were forced to file a second lawsuit to prompt Defendant to cease falsely reporting Plaintiffs' debt.

......things continued downhill from there but that's enough to give the Court a good view into the abusive pattern and practices of Respondent: They will get you in any which way they can:

> Assuming arguendo that Defendant's continued reporting of false information regarding Plaintiffs' debt was not intentionally done, the question then is whether Defendant acted in reckless disregard of its obligations under the FCRA, as the district court concluded. On the record before us, it clearly did so (at 20).

> After careful review and with the benefit of oral argument, we: (1) affirm the district court's finding of a willful FCRA violation, but reverse the court's denial of emotional distress and punitive damages; (2) reverse the grant of summary judgment for Defendant on the Florida Collections Act claim; (3) reverse the grant of summary judgment for Defendant on the breach of contract claim; (4) vacate the award of attorney's fees to Plaintiffs so that the district court can recalculate those fees at the conclusion of the litigation; 1 and (5) remand for proceedings consistent with this opinion (at 4).

iv.    West Virginia.

In West Virginia, Carrington faced a lawsuit – much as they are about to face one here – and wisely decided to settle the case. This time, it was predatory lending relating to a grossly inflated valuation of the home of Plaintiff's parents incident to a predatory loan the violated all tenets of basic LTV principles, i.e. $85,000.00 vs. $15,000.00. Sadly, Carrington may fairly be seen to provide a seamless web of deceit, abuse, and corruption in all aspects of home financing.

According to Pacer Monitor on October 16, 2019 the Parties in *Kelly Jo Young v. Carrington* 2:19-cv-00391 (West Virginia 2019) are engaged in final Settlement negotiations, to wit:

> ORDER WITHDRAWING MOTION TO DISMISS AND STAYING CASE granting17 Notice of Withdrawal of their Motion to Dismiss Plaintiff's Complaint and Consent Request to Stay Deadlines; Defendants'6 Motion to Dismiss the Plaintiffs Complaint is withdrawn; all deadlines in this matter shall be stayed for a period of 30 days following the date of this Order while the parties finalize their settlement of this matter. Signed by Judge Joseph R. Goodwin on 10/16/2019.

v.    Virginia.

This is another apparent settlement. Dana Hawes filed Class Action lawsuit against Bank of America and Carrington in *Hawes vs. Bank of America et al.*, 3:17-cv-00346 (Virginia, February 3, 2018):

> Bank of America, N.A. and Carrington Mortgage Services, LLC are facing a Virginia consumer's proposed class action claiming the companies broke the law by wrongfully foreclosing on his home without satisfying certain conditions precedent to foreclosure in the man's deed of trust. According to the lawsuit, the plaintiff's deed of trust, which was insured by the Federal Housing Administration (FHA), mandated a face-to-face meeting between the man and the defendants *before* foreclosure could take place on his home.
> Further, the lawsuit claims Carrington Mortgage violated the Real Estate and Settlement Procedure Act (RESPA) with its alleged failure to follow certain mandatory steps after receiving the plaintiff's complete mortgage assistance application at least 37 days before the foreclosure sale.

> "As a matter of policy and common practice, [the defendants] made absolutely no effort to arrange a face-to-face meeting with [the plaintiff] or the putative class before three full monthly installments due on the mortgage are unpaid," the case claims. "Moreover, consistent with its policy not to conduct face-to-face interviews, [the defendants] never made a trip to [the plaintiff's] home where its intent was to provide loss mitigation services within this timeframe."

> [So Ordered re50 Stipulation of Dismissal filed by Carrington Mortgage Services, LLC, Bank of America, N.A. Signed by District Judge M. Hannah Lauck on 02/13/2018. (tjoh, )]

> [STIPULATION of Dismissal and Consent Order by Bank Of America, N.A.,, Carrington Mortgage Services, LLC,. (Rose-Smith. Sabrina)]

vi.  Massachusetts.

## Saugus Family at Risk of Foreclosure Due To 'Immoral, Outrageous' Behavior By Carrington Mortgage
https://fraudstoppers.org/saugus-family-risk-foreclosure-due-immoral-outrageous-behavior-carringtonmortgage/

## Fraud Stoppers July 12, 2017

The family's home loan was sold to a servicer called Carrington Mortgage, who Kelly says was incredibly difficult to communicate with as she tried to avoid foreclosure on her Saugus home of eight years.

"We couldn't get them to talk to us," Kelly told KHTS last week, with a foreclosure date of July 17 looming over her. "They were telling us they had no records of our stuff; they

had no payments, (but) they weren't sending us payment notices… It was really just confusing."

When all hope seemed lost, what Kelly called a "godsend" came into their lives, the help of a Santa Clarita realtor who provides free loan modification and foreclosure defense services to the public.

Rich Szerman of Alta Realty Group promptly got to work on submitting a loan modification request to Carrington Mortgage, and quickly realized this seemingly simple task would be nearly impossible.

While Szerman claims he's been attempting to submit the Kinneys' completed file since May 15, Carrington officials have allegedly put up obstacle after obstacle, ranging from losing paperwork to requiring a "special code" that no one seemed to know before any action could be taken.

"They have lied and cheated and done everything they possibly can to avoid doing this loan modification since the day we got the file," Szerman said.
https://www.youtube.com/watch?v=PveBv-XQ1QE



## CLAIMS AND PRELIMINARY INJUNCTION DEMAND

34. Defendant's actions have continued during the period of this litigation, with ongoing threat to unlawfully divest Plaintiff of her Property Interests.

15

35. Defendant currently holds a Writ of Possession that was obtained pursuant to a Hearing, for which Plaintiff was not Noticed nor Present.

36. Plaintiff works from home full-time. In the past two days, she has seen an unmarked Sheriff's car in her driveway while she was on conference calls for work. She also received a phone call from the same Civil Process Server who served her with the bogus Foreclosure complaint back in 2018: John Davis, phone # 207-631-8983.

37. Significantly, Defendant refused to even lease the property back to Plaintiff, even though there is more than sufficient household income between Plaintiff and her spouse to support a monthly lease payment, because they are maliciously throwing out "the idiot homeowner" so that they can finish laundering the Title because they didn't have good Title *ab initio*. As such, regardless of whether Defendant believes her to be an "idiot," Plaintiff reasonably fears that these Sherriff's cars appearing in her driveway at various times over the past couple of days may very likely be a Civil Process Server relative to the Writ of Prohibition.

## FACTORS SUPPORTING A TEMPORARY RESTRAINING ORDER

See generally *Tuck vs. Wells Fargo Home Mortgage*, C-12-04002-DMR (2012)(more bad faith loan servicing);[2] *Khast v. WAMU*, 10-CV-2168 (JMA) (Oct. 26, 2010) also brought under §17200.

38. Courts recognize the loss of one's home as irreparable harm. This is especially true in this case as Plaintiff also works from home full-time as a Medical and Legal Transcriptionist and would lose not just some money, but her entire ability to earn a living, and she also has a total of 8 pets on Premises. She and her spouse were married in this home. They have 4 Golden Retriever dogs and 4 cats (their "furry children") that live in this home as well. The actions of Defendant have caused and will imminently cause Plaintiff and her spouse substantial irreparable harm. Said irreparable harm includes the loss of title to their beloved home of 12 years,

---

[2] Plaintiff is aware that Plaintiffs eventually lost in *Tuck*. However, Plaintiffs failed to appear in Court and their claims were also barred by Federal Preemption. No such issues cloud this case.

anticipated possession of their home, and ongoing extreme emotional distress that cannot be adequately compensated at law.

39. Plaintiff has a substantial likelihood of success on the merits to set aside the sale of her home based on the documentary evidence available to date, including the fact that Defendant cannot demonstrate a clean or valid Chain of Title as noted by highly regarded and successful New England Foreclosure Defense Attorney, Thomas Cox, nor can it refute Plaintiff's claims regarding unlawful Dual-Tracking as she had completed *multiple* Loss Mitigation packages that all went completely ignored. Plaintiff will be calling the HUD Counselor who helped her complete some of the multiple complete packages that she sent to Defendant, so Defendant issued false notices of noncompliance under § 1002.9(c)(2) and there is a violation of Regulation X § 1024.41 (f)(g) or (j) involved.

This is the exact same situation faced by the suffering "idiot" Massachusetts homeowner noted above in which:

> Rich Szerman of Alta Realty Group promptly got to work on submitting a loan modification request to Carrington Mortgage, and quickly realized this seemingly simple task would be nearly impossible.
>
> While Szerman claims he's been attempting to submit the Kinney's completed file since May 15, Carrington officials have allegedly put up obstacle after obstacle, ranging from losing paperwork to requiring a "special code" that no one seemed to know before any action could be taken.
>
> "They have lied and cheated and done everything they possibly can to avoid doing this loan modification since the day we got the file," Szerman said.

**********

From *Khast, supra.*
In this case, Plaintiff has alleged (a) that Defendant WAMU promised to modify Plaintiff's loan if Plaintiff stopped making payments and defaulted, (b) that Plaintiff relied on Defendant's promise and therefore stopped making payments and entered default, and (c) that Defendant failed to modify Plaintiff's loan as promised. Plaintiff has stated that he possess documents to support this claim, and he has thus shown that he is likely to succeed on the merits of his promissory estoppel claim. See *Youngman*, 10 Cal. 2d at 249-51; *Garcia*, 107 Cal. Rptr. 3d at 695-97.

In this case, Plaintiff has documents and witnesses to show that she, too, completed the process on more than one occasion, but was repeatedly stonewalled.

40. A Preliminary Injunction is necessary to maintain the status quo until Plaintiff's claims for the set aside of any potential foreclosure sale can be fully and finally determined.[3]

41. Public Interest and a balance of the equities favors a Preliminary injunction to maintain the status quo. Defendants are not prejudiced to any material extent by the passage of time in waiting for a full and final adjudication of the action concerning any potential sale and entry. By contrast, Plaintiff would be prejudiced, irreparably injured, and her claims become moot if she were to be evicted or otherwise dispossessed from her home in the absence of an injunction. A bond is unnecessary as the Plaintiff has a vested interest in the subject property.

> From *Khast, supra.*
> There is a strong interest in accurately resolving ownership of real property. See *DaSilva v. Wells Fargo Bank, N.A.*, No. 3:10-cv-00381, 2010 WL 3910139, at *7 (D. Nev. Oct. 1, 2010) ("[The]public interest in the prevention of improper nonjudicial foreclosures is great."); *Perry v. Nat'l Default Servicing Corp.*, No. 10-CV-03167, 2010 WL 3325623. at *6 (N.D. Cal. Aug. 20, 2010) (nothing that preventing a party from proceeding with a foreclosure sale to which it is entitled does not serve the public interest). Because Plaintiff has demonstrated likelihood of success on the merits, Plaintiff has shown that the public interest favors granting his request for a temporary restraining order.

WHEREFORE, Johanna R. Wheeler (the "idiot" homeowner) hereby demands:

a. That this Court restrain and enjoin Defendant from conveying title until the claims for set aside of the foreclosure sale have been determined by the Court.

b. That this Court restrain and enjoin Defendant from evicting or in any other way dispossessing Plaintiff or her immediate family and invitees from the Property, or

---

[3] Unfortunately, Attorney Cox currently has a caseload far too large to handle this case and could not immediately make a referral as competent Foreclosure Defense Lawyers are a very scarce commodity.

taking any action to interfere with her quiet enjoyment of the Property until the claims for set aside of the foreclosure sale have been determined by the Court.

c. That upon final judgment, this Court prohibit any foreclosure sale.

d. That the Court award actual damages, punitive damages, court costs, attorney fees, expert fees, and any and all other relief as deemed appropriate.


Respectfully submitted,

Johanna R. Wheeler
Plaintiff Pro Se

JW

**EXHIBIT A**

N O T      N O T
A N        A N

A certain lot or parcel of land, together with the buildings thereon, situate in Hampden, County of Penobscot, State of Maine, more particularly bounded and described as follows, to wit:

N O T                 N O T

Being Lot 21, as shown on a Plan of Land of Cool Brook Acres dated November 10, 1977, recorded in the Penobscot County Registry of Deeds on November 14, 1977, in File D132-77.    C O P Y               C O P Y

ALSO CONVEYING an easement for purposes of ingress and egress over and along Emerson Avenue and Ruth Avenue as depicted on Plan of Cool Brook Acres, recorded in File D132-77. Said easement to be used in common with others and their heirs and assigns.

Being the same premises conveyed by Warranty Deed of Gwen M. Rafford to Jennifer C. Weston dated December 15, 2006 and recorded in Book 10768, Page 146 of the Penobscot County Registry of Deeds. Reference is also made to the Abstract of Divorce Decree between Cary Weston and Jennifer Weston dated February 28, 2007 and recorded in Book 10854, Page 272 of said Registry in which it is stated that the Plaintiff, Cary Weston, shall have no right, title or interest in said real property as the Defendant, Jennifer Weston, took title the property in her name only.

For Grantor's source of title reference may be had to Warranty Deed of Jennifer C. Weston Cyr, f/k/a Jennifer C. Weston, to Johanna R. Wheeler of substantially even date and to be recorded simultaneously in the Penobscot County Registry of Deeds.

PENOBSCOT COUNTY, MAINE

*Susan F. Bulay*
Register of Deeds

A-13397-A WHEELER EXA (l/ind/comms/may08)
36 Ruth Avenue, Hampden

N O T
A N
O F F I C I A L
C O P Y

A N
O F F I C I A L
C O P Y

Bk 12860 Pg88 #18673
06-26-2012 @ 08:42a

N O T
A N
O F F I C I A L
C O P Y

DocID# 1392257977240620

Property Address:
36 Ruth Ave
Hampden, ME 04444-1522
Property Location:
Township of HAMPDEN
ME0-AM 17809176        6/13/2012

This space for Recorder's use

Recording Requested By:
Bank of America
Prepared By:
Bank of America
800-444-4302
1800 Tapo Canyon Road
Simi Valley, CA 93063

When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

MIN #: 100029500026005920        MERS Phone #:  888-679-6377

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 1901 E Voorhees Street, Suite C, Danville, IL 61834 does hereby grant, sell, assign, transfer and convey unto **BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING, LP** whose address is C/O BAC, M/C: CA6-914-01-43, 1800 Tapo Canyon Road, Simi Valley, CA 93063 all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Original Lender:        **TAYLOR, BEAN & WHITAKER MORTGAGE CORP.**
Borrower(s):        **JOHANNA R. WHEELER**
Date of Mortgage:        5/19/2008
Original Loan Amount:        $142,525.00

Recorded in Penobscot County, ME on: 5/20/2008, book 11397, page 2 and instrument number 14444

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on
_____ JUN 1 4 2012 _____

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By: _____

Rene Rosales Assistant Secretary

Bk 12860 Pg89 #18673

```
        N O T              N O T
         A N                A N
O F F I C I A L    O F F I C I A L
   C O P Y            C O P Y
```

State of California
County of Ventura

```
        N O T              N O T
         A N                A N
```

On __JUN 14 2012__ before me, O F F Roudabeh Beygzadeh-Elias , Notary Public, personally
appeared _____ Rene Rosales _____, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.**

WITNESS my hand and official seal.

Notary Public: _____ Roudabeh Beygzadeh-Elias _____ (Seal)
My Commission Expires: _____ June 4, 2015

ROUDABEH BEYGZADEH-ELIAS
Commission # 1939621
Notary Public - California
Los Angeles County
My Comm Expires Jun 4, 2015

DocID# 1392257977240620

PENOBSCOT COUNTY, MAINE

Susan F. Bulay
Register of Deeds

N O T
A N
O F F I C I A L
C O P Y

N O T
A N
O F F I C I A L
C O P Y

N O T
A N
O F F I C I A L
C O P Y

N O T
A N
O F F I C I A L
C O P Y

RETURN TO:
M. E. Wileman
2860 Exchange Blvd. # 100
Southlake, TX 76092  **Assignment of Mortgage**  Send Any Notices To Assignee.
For Valuable Consideration, the undersigned, BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME
LOANS SERVICING LP FKA COUNTRYWIDE HOME LOANS SERVICING LP 1800 TAPO CANYON ROAD, SIMI
VALLEY, CA 93063 (Assignor) by these presents does assign and set over, without recourse, to CARRINGTON MORTGAGE
SERVICES, LLC 1600 South Douglass Road, Suite 200-A, Anaheim, CA 92806 (Assignee) the described mortgage with all
interest, all liens, any rights due or to become due thereon, executed by JOHANNA R WHEELER to MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC., (MERS) AS NOMINEE FOR TAYLOR, BEAN & WHITAKER
MORTGAGE CORP. ITS SUCCESSORS AND ASSIGNS.  Said mortgage Dated: 5/19/2008 is recorded in the State of ME,
County of Penobscot on 5/20/2008, Instrument # 14444 Book 11397 Page 2 AMOUNT: $ 142,525.00  Property Address: 36
RUTH AVENUE, HAMPDEN, ME 04444

WHEELER   YNS *15077781*

IN WITNESS WHEREOF, the undersigned corporation/trust has caused this instrument to be executed as a sealed instrument by
its proper officer.  Executed on: 7-2-2015
BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING LP FKA COUNTRYWIDE
HOME LOANS SERVICING LP  BY CARRINGTON MORTGAGE SERVICES, LLC AS ATTORNEY-IN-FACT

By: _____
**Chris Lechtanski, AVP of Default**

Witness: _____
**Raschelle Holmes**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document
to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of CA   County of Orange
On 7-2-2015 before me, W. Solano , Notary Public, personally appeared Chris Lechtanski
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.
WITNESS my hand and official seal.

_____
Notary public, W. Solano
My commission expires: 7-10-18

W. SOLANO
COMM. # 2071244
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
COMM. EXPIRES JULY 10, 2018

ME Penobscot

6000003477
CMS/BIC4-16-15/AOM/M

PENOBSCOT COUNTY, MAINE

Susan F. Bulay
Register of Deeds

Property Address:     N O T         N O T
36 Ruth Avenue,      A N          A N
Hampden, Maine 04444 F I C I A L    O F F I C I A L
           C O P Y         C O P Y

## N O T QUITCLAIM ASSIGNMENT T

WHEREAS, Taylor, Bean & Whitaker Mortgage Corp. is the "Lender" on a certain

mortgage executed by Johanna R. Wheeler , and bearing the date of May 19, 2008 and recorded

on May 20, 2008 in the Penobscot County Registry of Deeds in Book 11397 at Page 2

(hereinafter the "Mortgage");

WHEREAS, Taylor, Bean & Whitaker Mortgage Corp. has certain rights that are

described in the Mortgage;

WHEREAS, Mortgage Electronic Registration Systems, Inc. ("MERS") was designated

the mortgagee in the Mortgage as the nominee of Taylor, Bean & Whitaker Mortgage Corp. and

its successors and assigns, and MERS was the stated mortgagee of record;

WHEREAS this Quitclaim Assignment is not intended to and does not modify or assign

any of the rights, title or interest that MERS had in the Mortgage; and

WHEREAS, Taylor, Bean & Whitaker Mortgage Corp. wishes to convey and assign any

and all rights it may have under the Mortgage.

Accordingly Taylor, Bean & Whitaker Mortgage Corp. hereby **ASSIGNS AND QUIT**

**CLAIMS** to Carrington Mortgage Services, LLC all of its rights, title and interest (whatever they

may be, if any) in the Mortgage to Carrington Mortgage Services, LLC .

IN WITNESS WHEREOF, the said __Elizabeth Gonzales__, the

[title] __Default Document, Team Lead__ A N
O F F at Carrington Mortgage Services, LLC as Servicer and Attorney-in-
C O P Y                    C O P Y
fact for Government National Mortgage Association for Taylor, Bean & Whitaker pursuant to

N O T                    N O T
12 U.S.C., 1721 (g), thereunto duly authorized, has executed this instrument on the __4th__ day

O F F I C I A L          O F F I C I A L
of the month of __October__, 20__12__.       C O P Y

**Carrington Mortgage Services, LLC as Servicer
and Attorney-in-fact for Government National
Mortgage Association for Taylor, Bean &
Whitaker pursuant to 12 U.S.C., 1721 (g)**

Witness **Maurreene D. Magdaleno**

**Default Document, Sr. Analyst**

its: Elizabeth Gonzales, Default Document Team Lead for
Print name Carrington Mortgage Services, LLC as Attorney in Fact

STATE OF _____
COUNTY OF _____          Date: _____

I HEREBY CERTIFY that on this day, before me, an officer duly authorized to take
acknowledgements, personally appeared _____, the
_____ at Carrington Mortgage Services, LLC as attorney-in-fact for Taylor
Bean & Whitaker Mortgage Corp., who is personally known to me, or who produced
_____ **SEE ATTACHED** ____ion and who swore or affirmed and
subscribed the foregoing instrument as his/her free act and deed, in his/her said capacity, and the
free act and deed of the said Carrington Mortgage Services, LLC as Servicer and attorney-in-fact
for Taylor, Bean & Whitaker Mortgage Corp.

_____
Notary Public Signature

Document type:      Quitclaim Assignment
Borrower:           Johanna R. Wheeler
Property Address:   36 Ruth Avenue, Hampden, ME 0444

Our File #: 5538209

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

# CALIFORNIA ALL – PURPOSE

# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of Orange

On __OCT 0 4 2017__ before me, __W. Solano__, Notary Public, personally appeared, Elizabeth Gonzales, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ___W. Sol___ (Seal)

W. SOLANO
COMM. # 2071244
NOTARY PUBLIC · CALIFORNIA
ORANGE COUNTY
COMM. EXPIRES JULY 10, 2018

◆━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━◆

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

AoM

(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages _____ Document Date _____

(Additional information)

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they,- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

Susan F. Bulay, Register
Penobscot County, Maine

After Recording Return To:
**GRIFFIN & JORDAN, LLC**
**68 MAIN STREET**

**ORONO**          **, ME**          **04473**

N O T
A N
O F F I C I A L
C O P Y

N O T
A N
O F F I C I A L
C O P Y

N O T
A N
O F F I C I A L
C O P Y

N O T
A N
O F F I C I A L   
C O P Y

──────────────── [Space Above This Line For Recording Data] ────────────────

# MORTGAGE

**MIN: 100029500026005920**

## WORDS USED OFTEN IN THIS DOCUMENT

Words used in multiple sections of this document are defined below. Other words are defined in Sections 3, 5, 8, 10, 11, 13, 18, 20 and 21. Certain rules about the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated **May 19, 2008**
The term "Security Instrument" includes any Riders recorded with the Security Instrument.

**(B)** "**Borrower**" means **Johanna R. Wheeler**

who sometimes will be called "Borrower" and sometimes simply "I" or "me." "Borrower" is granting a mortgage under this Security Instrument. "Borrower" is not necessarily the same as the Person or Persons who signed the Note. The obligations of Borrowers who did not sign the Note are explained further in Section 13.

**(C)** "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. **FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE MORTGAGEE OF RECORD.**

**(D)** "**Lender**" means **Taylor, Bean & Whitaker Mortgage Corp.**
Lender is a corporation or association which exists under the laws of **FL**
Lender's address is **1417 North Magnolia Ave, Ocala, FL 34475**

Except as provided in Sections 13 and 20, the term "Lender" may include any Person who takes ownership of the Note and this Security Instrument.

*0240752600592*

A-13397-A

JW

(E) "**Note**" means the note signed by **Johanna R. Wheeler** and dated **May 19, 2008** . The Note shows that its signer or signers owe Lender **One Hundred Forty Two Thousand Five Hundred Twenty Five and no/100** Dollars (U.S. $ **142,525.00** ) plus interest and promise to pay this debt in Periodic Payments and to pay the debt in full by **June 01, 2038**.

(F) "**Property**" means the property that is described below in the section titled "Description of the Property" or any portion of the Property.

(G) "**Sums Secured**" means the unpaid balance of amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property."

(H) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider  ☐ Second Home Rider

☐ Balloon Rider  ☐ Planned Unit Development Rider  ☐ Other(s) [specify]

☐ 1-4 Family Rider  ☐ Biweekly Payment Rider

(J) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "**Escrow Items**" means those items that are described in Section 3.

(N) "**Miscellaneous Proceeds**" means any monies or other thing of value paid by any third party, other than insurance proceeds paid under the coverages described in Section 5, for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property (see Section 11 for an explanation of "Condemnation"); (iii) conveyance in lieu of Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation

or regulation that governs the same subject matter. When this Security Instrument refers to a requirement or restriction under "RESPA," Lender intends to abide by that requirement or restriction, even if it is not technically applicable to the Loan.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**(S) "Ground Rents"** means amounts I owe if I rented the real property under the buildings covered by this Security Instrument. Such an arrangement usually takes the form of a long-term "ground lease."

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors and assigns), with mortgage covenants, subject to the terms of this Security Instrument, to have and to hold all the Property to MERS (solely as nominee for Lender and Lender's successors and assigns), and to its successors and assigns, forever. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to Lenders who hold mortgages on real property. Those rights that Applicable Law gives to Lenders who hold mortgages on real property include those rights known as "Mortgage Covenants." I am giving Lender these rights to protect Lender from possible losses that might result if:

    (A)  Some or all of the Loan is not paid when due;

    (B)  I fail to pay, with interest, any amounts that Lender spends under Section 9 of this Security Instrument to protect the value of the Property and Lender's rights in the Property; or

    (C)  I fail to keep any of my other promises and agreements under this Security Instrument. These amounts are the "Sums Secured."

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

    (A)  to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

    (B)  to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

## DESCRIPTION OF THE PROPERTY

I grant and mortgage to MERS (solely as nominee for Lender and Lender's successors in interest) the Property described in (A) through (G) below:

    (A)  The Property which is located at         **36 Ruth Avenue**
[Street]

        **Hampden** , Maine     **04444**     ("Property Address").
      [City]                 [Zip Code]

This Property is in **Penobscot**          County. It has the following legal description:

**See Attached Exhibit A.**

    (B)  All buildings and other improvements that are located on the Property described in subsection (A) of this section;

    (C)  All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

JW

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains promises and agreements that vary, to a limited extent, in different parts of the country. My promises and other agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

1. **Borrower's Promise to Pay.** If I signed the Note, I will pay to Lender when due principal and interest due under the Note and any prepayment charges and late charges due under the Note. Regardless of whether I signed the Note, I will pay funds for Escrow Items as described in Section 3. I will make all payments in U.S. currency. If any Borrower makes any Loan payment to Lender with a check or other instrument that is returned for any reason (i.e., the check bounces), except when prohibited by Applicable Law, the Lender may require that any subsequent payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check (all of which must be drawn on an institution whose deposits are insured by a federal agency, instrumentality, or entity); or (d) Electronic Funds Transfer. Lender may reasonably specify which payment form is required.

Payments are only considered received when they reach the Lender's address specified in the Note, or a different address specified by Lender under Section 15 of this Security Instrument. Lender may return any payments or partial payments if the payments are insufficient to bring the Loan current. Lender may accept any payments or partial payments insufficient to bring the Loan current, but doing so will not affect Lender's rights under this Security Instrument, and Lender may still refuse such late, partial payments in the future.

I agree that no claim or legal right I may have against the Lender will excuse my obligation to make timely payments under the Loan or to keep my other promises in this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender will be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts payable under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts will be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from me for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent Periodic Payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from me to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary extra payments must be applied first to any charges for making voluntary extra payments and then as described in the Note.

N O T        N O T

If voluntary extra payments I may make or the crediting of insurance proceeds or Miscellaneous Proceeds to the Note are enough to pay principal ahead of schedule, I must still make my regularly scheduled Periodic Payments under the Note, when scheduled, without any delay or reduction of amount.    C O P Y

**3.   Monthly Payments for Taxes and Insurance.**

(a)   **Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a loss reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward the payment of the following items, which are called "Escrow Items:"

(1)   The taxes, assessments and other items which under the Applicable Law may be or become superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "lien;"

(2)   The leasehold payment or Ground Rents on the Property (if any);

(3)   The premium for insurance covering the Property required under Section 5;

(4)   The premium for Mortgage Insurance (if any);

(5)   The amount I may be required to pay Lender under Section 10 below instead of the payment of the premium for Mortgage Insurance (if any); and

(6)   If Lender requires, Community Association Dues, Fees, and Assessments.

After signing of the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment that I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

I will promptly send Lender a copy of all notices of amounts to be paid under this Section. I must pay Lender for Escrow Items as part of my regular Periodic Payments, unless Lender excuses this requirement in writing. If Lender excuses me in writing, I will pay all Escrow Items covered by the excuse, directly and on time. I will provide receipts proving my direct payments of Escrow Items on request and in the time period Lender requires. If Lender excuses me from paying Escrow Items to Lender and if I fail to pay any amount due for an Escrow Item directly, Lender may pay such amount under Section 9, and I will be obligated to repay Lender, plus interest at the Note rate. Lender may revoke the excuse regarding any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, I will pay to Lender all Funds (defined below), and in such amounts, that are then required under this Section 3.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called the "Funds." The Funds are pledged as additional security for all Sums Secured.

Lender may, at any time, collect and hold Funds in an amount (1) sufficient to permit Lender to apply the Funds at the time specified under RESPA, but (2) not to exceed the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

(b)   **Lender's Obligation.** Lender will keep the Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Funds. Lender will use the Funds to pay the Escrow Items. Lender will give to me, without charge, an annual accounting of the Funds. That accounting must show all additions to and deductions from the Funds and the reason for each deduction in the manner required by RESPA.

Lender may not charge me for holding or keeping the Funds, or for using the Funds to pay Escrow Items, or for making a yearly analysis of my payment of Funds or for receiving, verifying and totaling assessments and bills. Maine law requires payment of, and Lender agrees to pay me, interest on the Funds in the manner and amount set forth in Maine law.

(c)   **Adjustments to the Funds.** If there is a surplus of Funds held in escrow, as defined under RESPA, Lender will report to me regarding the excess funds in accordance with RESPA. If there is a shortage or deficiency of Funds held in escrow, as defined under RESPA, Lender will notify me as required by RESPA and I will pay to Lender the amount necessary to make up the shortage or deficiency as required by RESPA, but in no more than 12 monthly payments.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Funds that are then being held by Lender.

**4.   Borrower's Obligation to Pay Charges, Assessments and Claims.** I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be or become superior to this Security Instrument. If I am a tenant under a ground lease on the Property, I will also pay Ground Rents or payments due under my ground lease. I

will also pay any Community Association Dues, Fees, and Assessments. I will do this either by making the payments to Lender that are described in Section 3 above or, if I am not required to make payments to Lender under Section 3, by making the payments on time to the Person owed them. In this Security Instrument, the word "Person" means any natural person, organization, governmental authority or other party.

I will promptly pay or satisfy all liens against the Property that may be or become superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation (but I must perform my agreement or this exception does not apply); (b) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced (but this exception ends when the lawsuit ends); or (c) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance; Use of Insurance Proceeds.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by: (a) fire; (b) hazards normally covered by "extended coverage" hazard insurance policies; and (c) other hazards for which Lender requires coverage, including floods and earthquakes. The insurance must be in the amounts (including deductibles) and for the periods of time required by Lender. Lender's requirements can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. If I do not maintain any of the insurance coverages described above, Lender may obtain insurance coverage at its option and charge me in accordance with Section 9 below.

Lender is under no obligation to purchase any particular type or amount of coverage. Lender's coverage will protect Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the Lender's insurance coverage might significantly exceed the cost of insurance that I could have obtained. Any amounts paid by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with interest, upon notice from Lender to me requesting payment.

Lender may require me to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. I will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from my objection.

All of the insurance policies required by Lender and renewals of those policies: (a) are subject to Lender's right to disapprove; (b) must include what is known as a "standard mortgage clause" to protect Lender; and (c) must name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewal certificates must be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts for paid premiums and renewal notices that I receive.

If I obtain additional insurance for damage to or destruction of the Property not required by Lender, I will ensure that it contains a standard mortgage clause and names Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by any insurance company with regard to the Property is called "Proceeds." The Proceeds will be used to repair or to restore the damaged Property whether or not the underlying insurance was required by Lender unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Proceeds will be used to pay the Sums Secured. If any of the Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Proceeds will be paid to me. Such insurance proceeds will be applied in the order provided for in Section 2.

During the repair and restoration period, Lender will have the right to hold insurance proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction. Lender will arrange the

**MAINE**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM T2683L6 (0011)—MERS

*(Page 6 of 14 pages)*

Form 3020 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

inspection promptly. Lender may disburse Proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender will not be required to pay me any interest or earnings on Proceeds. Fees for public adjusters, or other third parties I retain, will not be paid out of the insurance proceeds and will be my sole obligation.

If I abandon the Property, or if I do not answer, within 30 days a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle any insurance claim. The 30-day period will begin when the notice is given.

If I abandon the Property, do not answer the notice, or if Lender acquires the Property under Section 22 below or otherwise, all of my rights in all insurance policies covering the Property will belong to Lender, other than the right to any refund of unearned premiums I have paid. Lender may use the insurance proceeds either to repair or restore the Property or to pay the Sums Secured, whether or not then due. However, Lender's rights in those Proceeds will not be greater than the Sums Secured.

**6. Occupancy.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligation to Maintain and Protect the Property; Inspections.** I will keep the Property in good repair. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate or diminish in value due to its condition whether or not I am residing in the Property. In addition, I will promptly repair the Property, if damaged, to avoid further deterioration or damage unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, I will be responsible for repairing or restoring the Property only if Lender has released Proceeds for such purposes. Lender may disburse Proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, I will not be relieved of my obligation to complete such repair or restoration.

Lender or its agents may enter and inspect the Property at reasonable times. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give me notice prior to an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I made false, misleading, incomplete, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan ("Material Information"), Lender will treat my actions as a default under this Security Instrument. I will also be in default if I knew about or consented to any other Person giving false, misleading, incomplete, or inaccurate statements about Material Information to Lender. False, misleading, incomplete, or inaccurate statements about Material Information would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, incomplete, or inaccurate statement of Material Information. Also, if during the loan application process I failed to provide Lender with Material Information, Lender will treat this as a default under this Security Instrument. I will also be in default if I knew about or consented to any other Person failing to provide Lender with Material Information.

**9. Lender's Right to Protect Its Rights in the Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture, for enforcement of a lien which may become superior to this Security Instrument or to enforce laws or regulations); or (c) I abandon the Property, then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding, may include appearing in court, paying reasonable attorneys' fees, paying superior liens on the Property, protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Securing the Property includes, for example, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. I agree that Lender incurs no liability for not taking any or all actions authorized under this Section 9.



I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the Note rate. Interest on each amount will begin on the date that the amount is spent by Lender.

If I do not own but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I subsequently purchase or otherwise become the owner of the Property, my interest as the tenant and my interest as the owner will remain separate unless Lender agrees in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage required by Lender lapses or ceases to be available from the original mortgage insurer, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available and if I was required to make separately designated payments toward the premiums for Mortgage Insurance, Lender will establish a loss reserve as a substitute for the Mortgage Insurance coverage. I will pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. Such loss reserve will not be refundable.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage again becomes available and is obtained. In that case, I will once again make Mortgage Insurance premiums. The Mortgage Insurance coverage must be in the amount and for the period of time required by Lender. Lender must approve the insurance company providing the coverage.

I will pay the Mortgage Insurance premiums, or the non-refundable loss reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the loss reserve payments, in the manner described in this Section 10.

This Section 10, and the existence or termination of my obligation to pay Mortgage Insurance premiums or reserve payments, does not affect my obligation to pay interest under the Note at the rate set by the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity, may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has—if any—regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements about Miscellaneous Proceeds and Condemnation of the Property.** I assign to Lender all Miscellaneous Proceeds (as defined above in subsection (M) of the section entitled "Words Used Often In This Document"). All Miscellaneous Proceeds will be paid to Lender. Miscellaneous Proceeds include, among other things, awards or claims for damages for Condemnation. A taking of property by any governmental authority by eminent domain is known as "Condemnation."

If the Property is damaged, all Miscellaneous Proceeds will be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During the repair and restoration period, Lender will have the right to hold Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction. Lender will arrange the inspection promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless

MAINE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM T2683L8 (0011)—MERS

*(Page 8 of 14 pages)*

Form 3020 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

JW

N O T                              N O T

an agreement is made in writing or Applicable Law requires interest to be paid on the Miscellaneous Proceeds, Lender will not be required to pay me any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured by this Security Instrument, whether or not then due, with the excess, if any, paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

If all of the Property is taken or destroyed, the Miscellaneous Proceeds will be used to reduce the Sums Secured, whether or not then due. If any of the Miscellaneous Proceeds remain after the Loan has been paid in full, the remaining proceeds will be paid to me.

Unless Lender and I agree otherwise agree in writing, if only a part of the Property is taken or destroyed, and the fair market value of the Property immediately before the partial taking or destruction either is equal to, or greater than, the amount of the Sums Secured immediately before the partial taking or destruction, then a portion of the Miscellaneous Proceeds will be applied to pay a portion of the Loan. That portion will equal the Miscellaneous Proceeds multiplied by a fraction. That fraction is as follows: (a) the total amount of the Sums Secured immediately before the partial taking or destruction; divided by (b) the fair market value of the Property immediately before the partial taking or destruction. The remainder of the Miscellaneous Proceeds will be paid to me.

Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, if only a part of the Property is taken or destroyed, and the fair market value of the Property immediately before the partial taking or destruction is less than the amount of the Sums Secured immediately before the partial taking or destruction, the proceeds will be used to reduce the Sums Secured whether or not then due.

If I abandon the Property, or if I do not answer within 30 days, a notice from Lender stating that the Opposing Party (as defined below) offered to make an award to settle a claim for damages, Lender has the authority to settle any claim and collect the proceeds. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a legal action in regard to Miscellaneous Proceeds. Lender may then use the Miscellaneous Proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

I will be in default if any lawsuit or other legal proceeding is brought seeking Forfeiture of the Property or seeking any other significant reduction of Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" means a legal order or judgment that takes away some or all of my rights in the Property, whether in a civil or in a criminal proceeding. I can cure that default by causing the lawsuit or legal proceeding to be dismissed with a legal ruling that, in Lender's reasonable judgment, precludes any Forfeiture or any other significant reduction of Lender's interest in the Property or rights under this Security Instrument. If there is any award or claim for damages for the reduction of Lender's interest or rights, the proceeds of that award or claim are assigned to and will be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations and of Lender's Rights.**

(a)  **Borrower's Obligations.** Lender may allow me, any Borrower, and any Successor in Interest of Borrower to delay or to change the amount of the Periodic Payments of principal and interest due under the Note or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Note and under this Security Instrument.

Lender may allow those delays or changes for a Successor in Interest of Borrower, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against a Successor in Interest of Borrower for not fulfilling obligations under the Note or under this Security Instrument, even if Lender is requested to do so by Borrower or a Successor in Interest of Borrower.

(b)  **Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property; (2) Lender accepts payments from third Persons or Successors in Interest; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make immediate payment in full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower and of Persons Taking over Borrower's Rights or Obligations.** Except as provided in Section 18, any Successor in Interest of Borrower who takes over my rights or obligations under this Security Instrument in writing and who is approved by Lender will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. I will not be released from my liability under this Security Instrument unless Lender agrees to that release in writing. Any Person who takes over Lender's rights or obligations under this Security

**MAINE**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM T2683L9 (0011)—MERS

*(Page 9 of 14 pages)*

Form 3020 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

JW

NOT                              NOT
Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security
Instrument, except as provided in Section 20.                OFFICIAL
    If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of
Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this
Security Instrument against each of us individually or against all of us together. This means that any one of us may be
required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security
Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that
Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender can agree with the other
Borrowers to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of
this Security Instrument or the Note without that Person's consent.       COPY

    **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default,
for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not
limited to, attorneys' fees, property inspection, and valuation fees. In regard to any other fees, the fact that this Security
Instrument does not expressly authorize Lender to charge a specific fee to Borrower should not be interpreted to be a
prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument
or by Applicable Law.

    If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest
or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits: (a) any such loan
charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already
collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by
reducing the principal owed under the Note or by making a direct payment to me. If a refund reduces principal, the reduction
will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for
under the Note). My acceptance of any such refund made by direct payment to me will constitute a waiver of any right of
action I might have arising out of such overcharge, unless Applicable Law expressly provides otherwise.

    **15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this
Security Instrument must be in writing. Any notice that must be given to me under this Security Instrument will be given by
delivering it or by mailing it by first class mail unless Applicable Law requires use of another method. The notice will be
effective or "given" when mailed (or, if not mailed, when actually delivered) to my address, unless Applicable Law requires
otherwise. Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires
otherwise. The notice will be addressed to me at the address stated in the section above titled "Description of the Property."
A notice will be given to me at a different address if I give Lender a notice of my different address. I will promptly notify
Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a
change of address through that specified procedure. There may be only one designated notice address under this Security
Instrument at any one time.

    Any notice that must be given to Lender under this Security Instrument will be given by delivering or mailing it to
Lender's address stated in subsection (C) of the section above entitled "Words Used Often In This Document." A notice will
be mailed or delivered to Lender at a different address if Lender gives me a notice of the different address. A notice to Lender
required by this Security Instrument is not given until it is actually received by Lender. If any notice required by this Security
Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding
requirement under this Security Instrument.

    **16. Law that Governs this Security Instrument; Interpretation.** This Security Instrument is governed by federal
law and the law that applies in the place where the Property is located. If any term of this Security Instrument or of the Note
conflicts with the Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which
can operate, or be given effect, without the conflicting provision. All rights and obligations contained in this Security
Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly
allow the parties to agree by contract or it might be silent, but such silence will not be construed as a prohibition against
agreement by contract.

    As used in this Security Instrument: (a) words of the masculine gender will mean and include corresponding neuter
words or words of the feminine gender; (b) words in the singular will mean and include the plural and vice versa; and (c) the
word "may" gives sole discretion without any obligation to take any action.

    **17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

    **18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** As used in this Section 18,
"Interest in the Property" means any interest in the Property recognized or protected by Applicable Law including, for

MAINE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3020 1/01
ITEM T2683L10 (0011)—MERS    *(Page 10 of 14 pages)*    GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

JW

example, those interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, if the intent is the transfer of title by Borrower at a future date to a purchaser.

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any interest in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require immediate payment in full. However, Lender will not require immediate payment in full if prohibited by Applicable Law.

If Lender requires immediate payment in full under this Section 18, Lender will give me a notice which states this requirement, following the procedures in Section 15. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Security Instrument discontinued. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) such other period as Applicable Law might specify for the termination of my right to reinstate; or (c) before a judgment has been entered enforcing this Security Instrument, if I meet the following conditions:

(1) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if immediate payment in full had never been required;

(2) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(3) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(4) I do whatever Lender reasonably requires to assure that Lender's Interest in the Property, Lender's rights under this Security Instrument, and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then the Note and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Section 18 above.

**20. Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Notice of Grievances.** The Note, or an interest in the Note, together with this Security Instrument, can be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects my Periodic Payments due under the Note and this Security Instrument and also performs other mortgage loan servicing obligations under the Note, this Security Instrument and Applicable Law is called the "Loan Servicer." There can be a change of the Loan Servicer as a result of the sale of the Note; there also can be one or more changes of the Loan Servicer unrelated to a sale of the Note. The law requires that I be given written notice of any change of the Loan Servicer. The written notice must be given in the manner required under RESPA. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA in connection with a notice of transfer of servicing. If the Note is sold, the Purchaser may hire a third party as Loan Servicer. In that case, the Loan Servicer, and not the Note Purchaser, will have mortgage loan servicing obligations to Borrower, except when the Note or Applicable Law expressly requires otherwise.

Lender and I agree that we will not start a lawsuit or legal proceeding or join, or be joined to, an existing lawsuit (such as a class action) that arises from the other party's actions pursuant to the Security Instrument or that claims the other party broke any promise or failed to fulfill any duty under this Security Instrument or relating to the Loan until: (a) the complaining party gives written notice in the manner provided in Section 15 to the other party; (b) the notice clearly describes the promise broken or the duty unfulfilled; and (c) the party receiving the notice is given a reasonable time to correct the problem. This provision does not apply if Applicable Law specifically authorizes a lawsuit by me against Lender under the facts in question and does not permit any cure or correction by Lender. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of default and opportunity to cure given to me pursuant to Section 22 and the demand for immediate payment in full given to

MAINE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
ITEM T2683L11 (0011)—MERS
(Page 11 of 14 pages)
Form 3020 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

JW

N O T     N O T

Borrower pursuant to Section 18 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

O F F I C I A L  O F F I C I A L

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection are called "Environmental Laws."

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous or as pollutants or wastes by Environmental Laws and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances."

C O P Y

An "Environmental Cleanup" includes any removal, remedial action or other response as defined in an Environmental Law. An "Environmental Condition" means a condition that can cause or contribute to or otherwise trigger an Environmental Cleanup.

Except as provided below: (a) I will not permit Hazardous Substances to be present on the Property; (b) I will not use or store Hazardous Substances on the Property; and (c) I will not allow anyone else to do so. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. However, I may permit the presence on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and I may use or store these small quantities on the Property.

I will not do anything affecting the Property that violates Environmental Laws, and I will not allow anyone else to do so. I will not create an Environmental Condition affecting the Property or permit anyone else to do so or do anything which due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.

If I know of: (a) any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws; (b) any Environmental Conditions, for example, any spill or leak of any Hazardous Substance; or (c) any condition relating to a Hazardous Substance that reduces the value of the Property, I will promptly notify the Lender in writing. If the government or a private party notifies me (or I otherwise learn) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, I will promptly take all necessary remedial actions as required by Environmental Laws.

This Section does not require the Lender to conduct or pay for any Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** After the occurrence of the conditions stated in subsections (a), (b) and (c) below, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. If all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

Lender may also require immediate payment in full if any of the events described in Section 18 occur, even if the conditions stated in subsections (a), (b) and (c) below are not met.

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law. These costs include reasonable attorneys' fees and costs of title evidence.

Lender may require immediate payment in full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument, including the promises to pay when due the Sums Secured;

(b) Lender sends to me, in the manner described in Section 15 above, a notice that states:

 (1) The promise or agreement that I failed to keep;

 (2) The action that I must take to correct that default;

 (3) A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;

MAINE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3020 1/01

ITEM T2683L12 (0011)—MERS   *(Page 12 of 14 pages)*   GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

(4) That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full and Lender or another Person may acquire the Property by means of foreclosure and sale;

(5) That if I meet the conditions stated in Section 19 above, I will have the right to have Lender's enforcement of this Security Instrument discontinued and to have the Note and this Security Instrument remain fully effective as if immediate payment in full had never been required; and

(6) That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering to the appropriate Registry of Deeds a discharge or release stating that this Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records (unless those costs were collected in advance of my loan closing).

**24. Payment During Foreclosure.** I agree that Lender may accept rents from the Property, hazard insurance proceeds, condemnation awards, and any other monies produced by the Property or paid by me, even though Lender has demanded immediate payment in full and begun foreclosure and sale under Section 22 above. Lender may use such monies to pay off any part of the Sums Secured without affecting Lender's right to continue foreclosure and sale.

**25. Riders to this Security Instrument.** The promises and agreements of each Rider are incorporated as a part of this Security Instrument.

JW

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 14 of this Security Instrument and in the Rider signed by me and recorded with it.

N O T      N O T
A N      A N
O F F I C I A L      F I C I A L
C O P Y      C O P Y

_____ (Seal)
Johanna R. Wheeler   -Borrower

_____ (Seal)
-Borrower

N O T      N O T
A N      A N
O F F I C I A L      O F F I C I A L
C O P Y      C O P Y

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Witness:          Witness:

_____      _____

State of   Maine
County of   Penobscot

The foregoing instrument was acknowledged before me this   19th day of May, 2008     (date) by

Johanna R. Wheeler

(name of person[s] acknowledged).

_____
Michael H. Griffin, Maine Attorney at Law

Notary Public, State of Maine

My commission expires:

Appendix B

WHEELER, JOHANNA

## Jason Thomas

| | |
|---|---|
| **From:** | Thomas Cox <tac@gwi.net> |
| **Sent:** | Tuesday, July 18, 2017 2:09 PM |
| **To:** | Jason Thomas |
| **Subject:** | Re: Taylor Bean Whitaker Mortgage |

Jason,

With this being a TBW loan using a MERS mortgage, they have a problem.   The two assignments, from MERS to B of A, and then from B of A to Carrington, are insufficient to get ownership of the mortgage, and thus standing to foreclose, to Carrington.

All of the recent declaratory judgment decisions regarding the MERS issue have been going our way, and I cannot see how Carrington is going to get the assignment that it needs from whatever successor to TBW there may be.  It would be awfully smart for Carrington to just find a way to modify this loan, because this think could be otherwise  stymied for a long time.

Give me a call if you have more questions.


Tom

Thomas A. Cox, Esq.
P.O. Box 1314
Portland, Maine 04104
(207) 749-6671
tac@gwi.net

> On Jul 18, 2017, at 1:29 PM, Jason Thomas <Jason.Thomas@ccimaine.org> wrote:
>
> Tom,
>
> It slipped my mind when we met in Yarmouth last week, but I have a client who's mortgage I wondered if you might look at briefly. I am attaching it here along with the 2 subsequent assignments to BOA and Carrington. We had been attempting to assist her with a loan mod, but she has been deemed ineligible as she has had a recent one and is not again eligible until 10/2017. However, based on the length of time in her delinquency and Carrington's lack of beginning a foreclosure action I was curious if the servicer here may believe there are some issues with the mortgage. It was a Taylor, Bean and Whitaker origination in 2008, assigned to Bank of America via MERS in 2012, and again to Carrington in 2015. Any insight would be greatly appreciated.
>
> Thanks as always!
>
>
> **Jason Thomas**
> Director, Housing Counseling and Education
> Email: Jason.Thomas@ceimaine.org

> <image69d29b.JPG>
> 30 Federal St
> Brunswick, Maine 04011

1